NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| S.M. and T.M. *on behalf of* Z.M.,<br><br>Plaintiffs,<br><br>v.<br><br>BRANCHBURG TOWNSHIP BOARD<br>OF EDUCATION,<br><br>Defendant. | Civ. No. 20-8991<br><br>**OPINION** |

THOMPSON, U.S.D.J.

## INTRODUCTION

This matter comes before the Court upon the Motion for Summary Judgment filed by Plaintiffs S.M. on behalf of Z.M. and T.M. on behalf of Z.M. (collectively, "Plaintiffs") (ECF No. 9) and the Motion for Summary Judgment filed by Defendant Branchburg Township Board of Education ("Defendant" or the "District") (ECF No. 15). The Court has decided the Motions based on the written submissions of the parties and without oral argument, pursuant to Local Civil Rule 78.1(b). For the reasons stated herein, Plaintiffs' Motion for Summary Judgment is denied, and the Defendant's Motion for Summary Judgment is granted.

## BACKGROUND

### I.    Factual Background

Plaintiffs S.M. and T.M. bring this case on behalf of their minor son, Z.M., under the Individuals with Disabilities Education Act ("IDEA"). 20 U.S.C. § 1400 *et seq.* When Z.M. was

1

sixteen months old, Plaintiffs brought him to a neurodevelopmental pediatrician for evaluation. (Pls.' Statement of Undisputed Material Facts ("SUMF") ¶ 3–4, ECF 9-2) The neurodevelopmental pediatrician diagnosed Z.M. with Autism Spectrum Disorder ("Autism") without intellectual impairment and without language impairment. (*Id.*; Def.'s Supplemental Statement of Facts ("SSF") ¶ 76, ECF 15-13) The doctor advised Plaintiffs that Z.M. required upwards of thirty-five hours per week of Applied Behavior Analysis ("ABA") instruction to provide adequate support for his diagnosis. (Pls.' SUMF ¶ 4.) Defendant states that the physician recommended that Z.M. receive twenty-five to thirty-five hours of ABA and parent training. (Def.'s SSF ¶ 77.) ABA instruction "is a research-based behavioral approach to teaching students with Autism." (Pls.' SUMF ¶ 4.)

    A.    *Z.M.'s Enrollment in Somerset Hills Learning Institute*

In October 2017, when Z.M. was two years old, Plaintiffs decided to enroll Z.M. in the Somerset Hills Learning Institute ("SHLI"), a private special education school that provides "Early Intervention" to students under the age of three. (Pls.' SUMF ¶ 5.) SHLI provides a Comprehensive ABA Program. (*Id.* ¶ 6.) According to the Behavior Analyst Certification Board ("BACB"), students in a Comprehensive ABA Program receive thirty to forty hours per week of ABA instruction in a 1:1 student-to-staff ratio. (*Id.* ¶ 7.) Over time, small group instruction is introduced. (*Id.*) Comprehensive ABA Programs require supervision by Board Certified Behavior Analysts "BCBAs," who only supervise six to twelve students at a time. (*Id.*)

When Z.M. entered SHLI, he scored in the sixth percentile on the Battelle Development Inventory, although he fell within the "average" range for cognition and communication skills.

(Pls.' SUMF ¶ 8; Def.'s SSF ¶ 80.)[1] Due to this low score, SHLI staff felt that he was "quite delayed." (Pls.' SUMF ¶ 8.) During his first three months at SHLI, Z.M. received only 1:1 instruction with no other students present. (*Id.* ¶ 9.) Beginning in January 2018, SHLI introduced Z.M. to once daily ten-minute sessions where two other students were present. (*Id.* ¶ 10.) During these sessions, Z.M. had his own instructor and "required a dense schedule of reinforcement." (*Id.*) Eventually, during these ten-minute sessions, Z.M.'s 1:1 teacher moved from being next to Z.M. to standing two feet behind him. (*Id.* ¶ 11.)

In June 2018, Dr. Kevin Brothers, SHLI's Director, concluded that Z.M. "still required a Comprehensive ABA program and was not ready for any inclusion general education instruction with typically developing peers." (*Id.* ¶ 12.) Around the same time, Z.M.'s Battelle Development Inventory was evaluated again, which showed that his interaction skills fell below the first percentile and that he "demonstrated no awareness of his peers." (*Id.* ¶ 13.)

B.    *Dr. Hannah Hoch's Evaluation of Z.M.*

Prior to Z.M.'s third birthday, SHLI referred Z.M. to the District to determine his eligibility for special education. (*Id.* ¶ 14.) Around the same time, Plaintiffs arranged for Dr. Hannah Hoch, a Ph.D. level BCBA, to evaluate Z.M. (*Id.* ¶ 15.) Plaintiffs stated that they hoped that Dr. Hoch ". . . would state that [Z.M.] did well in his program, and . . . didn't need intensive ABA and could go to regular preschool." (*Id.* ¶ 15.) Instead, Dr. Hoch opined that "the severity of [Z.M.'s] needs required that he continue to receive Comprehensive full-time ABA

---

[1] The Battelle Development Inventory, 2nd Edition, ("BDI-2") is an early childhood instrument based on the concept of developmental milestones. BDI-2 measures a child's progress along a developmental continuum through "global domains" and "discrete drill sets" in the following areas: Adaptive, Personal-Social, Communication, Motor, and Cognitive. (*See* Ex. Part 2 at 24, ECF No. 9-5.)

programming when he moved into preschool," and that he was not ready for "typical" preschool. (*Id.* ¶ 16.) Like Dr. Brothers, Dr. Hoch found that Z.M. was not ready for any inclusion in general education time with typical peers. (*Id.*) Rather, she stated that Z.M. "required explicit and systematic instruction in critical prerequisite skills to prepare him for ultimately being included alongside typical peers." (*Id.*) Dr. Hoch recommended that Z.M. continue to receive 1:1 ABA instruction during the entire school day and ongoing supervision of his program by a senior-level BCBA who was on site daily. (*Id.*) She also recommended that Z.M. receive a twelve-month program with no breaks, a "variety of research-based teaching procedures," an "active family consultation program," and thirty to forty hours per week of "individualized, intensive 1:1 ABA based intervention." (*Id.* ¶¶ 16, 17.) Dr. Hoch opined that removing Z.M. prematurely from Comprehensive ABA programming "would likely result in significant regression." (*Id.* ¶ 18.)

C.    *Z.M.'s Initial Identification and Evaluation Planning Meeting and the District's First Observation of Z.M. at SHLI*

On May 14, 2018, Plaintiffs and the District met for Z.M.'s Initial Identification and Evaluation Planning Meeting. (*Id.* ¶ 19.) Plaintiffs shared a copy of Dr. Hoch's report with the District. (*Id.* ¶ 19.) The District proposed to evaluate Z.M. through observing him at SHLI, conducting a "Social History" with his parents," and analyzing the results of a Battelle Developmental Inventory completed by the Early Intervention program at SHLI. (*Id.* ¶ 20.) Plaintiffs agreed. (*Id.* ¶ 21.)

In June of 2018, Heather Lilly, a Learning Disabilities Teacher Consultant serving as the District's case manager for Z.M., and Allison Eby, the District's BCBA, observed Z.M. at SHLI. (*Id.* ¶ 22.) Plaintiffs allege that while at SHLI, neither Lilly nor Eby asked SHLI staff about

4

Z.M.'s educational needs, their recommendations for how to meet Z.M.'s education needs, or Z.M.'s readiness for placement in general education instruction or group instruction. (*Id.* ¶ 23.) According to the District, Eby and Lilly observed Z.M. in multiple group settings, including group circle time and snack time. (Def.'s SSF ¶ 99.) At the time of the visit, Lilly requested that Z.M.'s SHLI teachers complete teacher input forms. (Def.'s SSF ¶ 23.) SHLI did not provide those forms, but did provide the District with Z.M.'s progress reports on July 18, 2018—a day prior to the parties' Individualized Education Program ("IEP") meeting. (*Id.*)

D.     *The District's First Proposed IEP For The 2018–2019 School Year*

The District created a draft IEP for Z.M. in early July of 2018. (Def.'s SSF ¶ 87.) The IEP called for a BCBA to supervise Z.M. for three hours a week. (Pls.' SUMF ¶ 25.) The IEP also called for Z.M. to be placed for half of the day in a self-contained preschool special education classroom consisting of eight students and three staff members, and half of the day in a general education preschool classroom, consisting of eleven students and three staff members. (Pls.' SUMF ¶ 31; Def.s' SSF ¶¶ 87, 97.) The IEP also stated that Z.M. would be accompanied full-time by a Registered Behavior Technician ("RBT"). (Def.'s SSF ¶ 97.) The proposed IEP noted "use of applied behavior analysis techniques for data-driven instruction" and "provide individualized instruction" under "Modifications." (*See* Ex. Part 2 at 75, ECF No. 9-5.)

Under the terms of the proposed IEP, Z.M. would participate in group instruction in both the special education classroom and the general education classroom. (Pls.' SUMF ¶¶ 32, 33.) The IEP called for a "supportive inclusion model," such that staff members would work within a group environment and typical peers would reinforce appropriate behavior. (Def.'s SSF ¶ 87.) Plaintiffs contend that the IEP did not call for any one-to-one instruction. (Pls.' SUMF ¶ 35.) However, Defendant states that the IEP included one-to-one instruction "from a certified special

education teacher who is highly trained in ABA," and an RBT, a position which requires forty hours of ABA training. (Def.'s SSF ¶ 89.) The IEP states "[Z.M.] needs time in a self-contained preschool setting for individualized intensive instruction, extensive practice and repetition of skills, and a small group environment to develop and practice the skills needed for the general education classroom." (Ex. Part 2 at 77.)

The Child Study Team exchanged emails regarding the proposed program prior to the IEP meeting. (Pls. SUMF ¶ 25.) On July 12, 2018, Eby emailed Lilly stating that the "justification for 3 hours per week of supervision for Z's program is that the BCBA credentialing board recommends 20% supervision (6 hours/week) for a quality program. Because his teacher is so highly trained in ABA, I believe 10% is adequate instead of 20%, but I wouldn't recommend offering less than 10% as it would be harder to defend this is a 'quality comprehensive ABA program' defined as the credentialing board defines it." (Ex. Part 2 at 53.) On July 18, 2018, Lilly asked Eby whether to add more goals to the IEP to incorporate the recently received progress reports from SHLI. (*Id*. at 39.) Eby responded "No, we said we were done with the draft. We can add it later." (*Id*.) In a follow up email, Eby stated "[t]hey are also going to expect we are offering an autism class and will ask why we are not." (*Id*.)

On July 19, 2018, Plaintiffs and the District's Child Study Team convened for an "Eligibility and IEP meeting." (Pls.' SUMF ¶ 27.) The District found Z.M. eligible to receive special education. (*Id.* ¶ 28.) The District then provided its proposed IEP. (Pls.' SUMF ¶ 29.) Plaintiffs state that they were "shocked" by the District's proposal to place Z.M. in general education for half of the school day. (*Id.* ¶ 38.) They were also "shocked" that, in their view, the District did not call for any ABA programming. (*Id.* ¶ 39.) According to the District, the "Plaintiffs were continually asked for input" during the meeting. (Def.'s SSF ¶ 24.) For example,

District employees asked Plaintiffs if they had any questions and told Plaintiffs that the proposed IEP would and could be modified based upon their feedback. (ALJ's Op. at 67, ECF No. 1-1.)

Plaintiffs requested to observe the District's Extended School Year ("ESY") program to get an understanding of what Z.M.'s program in the District would be. (Pls.' SUMF ¶ 43.) The District stated that the ESY program in session was different from the school-year program, so Plaintiffs could not observe the program until after the school year commenced in September 2018. (*Id.* ¶ 42.) On July 26, 2018, Plaintiffs notified the District that they intended to unilaterally continue Z.M.'s placement at SHLI at the beginning the 2018–2019 school year, because they were not able to observe the District's program prior to the start of the year. (*Id.* ¶ 45.) Plaintiffs and Dr. Hoch observed the District's proposed program on October 12, 2018. (*Id.* ¶ 47.) Dr. Hoch found the District's proposed program inappropriate for Z.M for the same reasons she had expressed previously. (*Id.* ¶ 48.) Plaintiffs also "had great concerns" after they observed the District's proposed program. (*Id.* ¶ 50.)

Plaintiffs did not give the District any feedback related to the IEP until December 2018. (Def.'s SSF ¶ 54.) On November 27, 2018 and December 7, 2018, Lilly reached out to Plaintiffs to discuss the IEP. (Def.'s SSF ¶ 107.) In response, Plaintiffs shared, through counsel, the observation report prepared by Dr. Hoch. (Pls.' SUMF ¶ 53.) Plaintiffs requested, based on Dr. Hoch's "strong opposition to the District's proposed program," that the District continue Z.M.'s placement at SHLI through his IEP. (*Id.*) They also advised the District that they planned to unilaterally place Z.M. at SHLI "should the District not agree to continue his placement there itself through his IEP." (*Id.*) Plaintiffs did not request an IEP meeting. Rather, their correspondence to the District states that should the District deem an IEP meeting necessary, they would attend. (Def.'s SSF ¶ 107.) Plaintiffs and the District did not meet to discuss Dr.

Hoch's report or Plaintiffs' correspondence. (Pls.' SUMF ¶ 54.)

Z.M. began the 2018–2019 school year at SHLI. (*Id.* ¶ 46.) In the fall, SHLI reduced Z.M.'s time in his group session from ten to five minutes a day because of Z.M.'s "poor peer interactions and disruptive behavior." (*Id.* ¶ 51.) By the spring, however, Z.M. was participating in ten minutes of group instruction, a forty-five-minute group lunch, and eventually another twenty-minute play period. (Def.'s SSF ¶ 104.)

E.   *The District's Second Proposed IEP for the 2018–2019 School Year and Second Observation of Z.M. at SHLI*

In December 2018, the District proposed a revised IEP for Z.M. (Pls.' SUMF ¶ 56.) The revised IEP reduced the time that Z.M. was placed in general education class from one-half to one-quarter of the school day. (*Id.* ¶ 58.) The IEP called for the District's BCBA to provide direct consultation to Z.M., rather than just consultation to his staff. (*Id.* ¶ 58.) The IEP also clarified that Z.M. would receive ABA instruction for over thirty hours a week. (Def.'s SSF ¶ 108.) The IEP also called for the District to work in conjunction with SHLI to "create a systemic plan to transition Z.M. to the District's proposed program." (Def.'s SSF ¶ 108.)

Dr. Hoch reviewed the second IEP and, despite the changes, reiterated her "strong recommendation" that Z.M. be placed in a Comprehensive ABA program like the one at SHLI. (Pls.' SUMF ¶ 58.)

Plaintiffs wrote to the District regarding Dr. Hoch's review of the second proposed IEP. (*Id.* ¶ 59.) Plaintiffs advised the District that they were prepared for litigation regarding Z.M.'s placement but "expressed their hope that the matter could still be amicably resolved." (*Id.*) Plaintiffs filed for due process on February 1, 2019. (*Id.* ¶ 60.)

In March 2019, Eby and Lilly observed Z.M. again at SHLI. (Def.'s SSF ¶ 113.) Eby and

8

Lilly observed that Z.M. was not receiving the social and pragmatic language instruction with the appropriate peer group. (*Id.*) Eby and Lilly's review of SHLI data indicated that Z.M. had made growth in working in groups. (*Id.*) Eby and Lilly also observed that Z.M. was behaving appropriately in a small group in a two-to-one student to staff ratio. (*Id.* ¶ 114.)

On May 14, 2019, the District reached to out to Plaintiffs via email to schedule an IEP meeting to discuss the 2019–2020 school year. (Pls.' SUMF ¶ 65.) Plaintiffs' attorney replied that she was unable to attend on the date proposed by the District and requested that the District provide other dates the parties could meet. (*Id.*) Plaintiffs contend that they never received a reply from the District. (*Id.* ¶ 66.) On July 9, 2019, the District issued its proposed IEP for the 2019–2020 school year. (*Id.* ¶ 69.)

Plaintiffs unilaterally continued Z.M.'s placement at SHLI for the 2019–2020 school year. (*Id.* ¶ 70.) In November 2019, SHLI began to take Z.M. to a local preschool for two hours per day two days a week. (Pls.' SUMF ¶ 72.) Plaintiffs' state that Z.M.'s "placement in the local preschool was done so that SHLI could study [Z.M.] in that setting and then provide direct 1:1 ABA instruction at SHLI to teach him skills needed to as to mitigate the difficulties he encountered there." (*Id.*)

## II.    The Due Process Hearing

A Due Process hearing was convened before Administrative Law Judge ("ALJ") Tama B. Hughes. (Pls.' SUMF ¶ 74.) Testimony was offered on July 10, 2019, September 11, 2019, September 27, 2019, and January 14, 2019. (*Id.*) The ALJ heard testimony from Eby, Lilly, T.M., Dr. Hoch, and Dr. Brothers. (*See* ALJ's Op. at 2–58.) On March 31, 2020, the parties filed closing briefs, and on May 8, 2020, the parties filed supplemental briefs. (Pls.' SUMF ¶ 74.) The ALJ issued her ruling on May 27, 2020. (*Id.*)

### III.    The ALJ's Decision

In her written decision, the ALJ made findings of credibility and fact. The ALJ then addressed the IDEA claims: (1) alleged procedural violations by the District; (2) alleged inappropriateness of the District's IEP; and (3) the reasonableness of the Plaintiffs' unilateral placement.

After summarizing the hearing testimony and the facts of the case, the ALJ made findings regarding to the credibility of the witnesses. Regarding Dr. Hoch and Dr. Brothers, while the ALJ acknowledged that they were highly knowledgeable in their respective fields, the ALJ found their testimony "biased," "subjective," and "agenda driven." (ALJ Op. at 59–60.) Specifically, the ALJ noted multiple instances in which Dr. Hoch and Dr. Brothers dismissed IEP proposals that—according to the ALJ—mirrored the offerings at SHLI or the suggestions in Dr. Hoch's evaluation. (*Id.*) The ALJ stated that, "regardless of what program the District put forward for Z.M.—even if it was identical to what SHLI was providing—[Dr. Hoch and Dr. Brothers] would have been critical of the District's program and opine[d] that continued placement at SHLI was in Z.M.'s best interest." (*Id.*)

With regard to T.M., the ALJ found that T.M. was credible and had "the best interests of her child at heart." (*Id*. at 62.) However, the ALJ found that T.M.'s statements must be taken in the context of her testimony that she had "little to no faith in the District given their experience with the District and how they handled her daughter." (*Id*.)

By contrast, the ALJ found Eby and Lily "knowledgeable in their respective fields" and stated that they "testified credibly as to what was taken into consideration in developing Z.M.'s IEP once the information was received." (*Id*.)

Next, the ALJ found that the District's alleged procedural violations did not deprive Z.M.

10

of his substantive rights under the IDEA and did not impede Plaintiffs' opportunity to participate in the decision making process. (*Id*. at 76.) Specifically, the ALJ found that the District "would have been remiss had they not prepared an initial template IEP based upon the information that it had available at the time…" and noted that the District "repeatedly attempted to engage petitioners in the process." (*Id*. at 77.) Moreover, the ALJ found that the failure to convene an IEP team meeting prior to the issuance of the second 2018/2019 IEP did not adversely affect the Plaintiffs' substantive rights. (*Id*.)

The ALJ then determined that the IEPs satisfied the requirements of the IDEA. As to the level of ABA services offered, the ALJ found that the "July 2018 proposed IEP provided Z.M. with an appropriately intensive ABA instruction throughout the day as well as an RBT." (ALJ's Op. at 79.) The ALJ found that the proposed IEP noted "use of ABA techniques for data-driven instruction" and "provide individualized instruction" under "modifications." (*Id*. at 68; *see also* Ex. Part 2 at 75.) Moreover, under "Supplementary Aids and Services," the IEP noted that Z.M. would be provided with an RBT throughout the day in both the special education and the general education classrooms. (ALJ's Op. at 68.) Taken together, the ALJ found that the certified special education teacher (who had completed ABA training as part of the BCBA coursework but failed the BCBA exam) and the RBT (who had forty hours of ABA training) would provide a sufficiently intensive ABA to Z.M. (*Id*. at 79, 83.) Because Z.M.'s proposed teacher and the RBT were "highly trained in ABA," the ALJ found that three hours of BCBA supervision was appropriately intensive. (*Id*.)

Similarly, the ALJ found that inclusion programming was appropriate, given that Z.M. did not have high levels of disruptive behavior, had average cognitive skills, and had average communication skills. (ALJ's Op. at 83.) The ALJ emphasized that placing Z.M. in a group

11

setting was necessary to comply with the IDEA's requirement that students receive their education in the "least restrictive environment that will provide meaningful educational benefit." (*Id*. at 83) (citing *Carlisle Area Sch.*, 62 F.3d 520, 535 (3d Cir. 1995)).

In sum, the ALJ found that the District proved "by a preponderance of the competent and credible evidence that the 2018/2019 and 2019/2020 IEPs proposed by the District offered Z.M. a free and appropriate education with the opportunity for meaningful educational benefit appropriate in light of Z.M's circumstances, within the least restrictive environment." (*Id*. at 84.) Because the ALJ found that the District satisfied its obligations under the IDEA, the ALJ did not consider whether the placement at SHLI was appropriate. (*Id*.)

## **LEGAL STANDARDS**

### I.     **The IDEA Statutory Scheme**

Under the IDEA, a state receiving federal education funding must provide a "free and appropriate public education" ("FAPE") to children with disabilities. 20 U.S.C. § 1412(a)(1). "To the maximum extent appropriate," such children must be educated in the "least restrictive environment." § 1412(a)(5). "School districts provide a FAPE by designing and administering a program of individualized instruction that is set forth in an IEP." *L.Y. ex rel. J.Y. v. Bayonne Bd. of Educ.*, 384 F. App'x 58, 60 (3d Cir. 2010) (citing 20 U.S.C. § 1414(d)). The IEP must be "'reasonably calculated' to enable the child to receive 'meaningful educational benefits' in light of the student's 'intellectual potential.'" *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 198 (3d Cir. 2004) (quoting *Polk v. Cent. Susquehanna Intermediate Unit 16*, 853 F.2d 171, 181 (3d Cir. 1988)); *see also Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001 (2017).

To determine liability for violations of the IDEA, district courts undertake a two-fold

inquiry: "(1) Has the school district complied with the procedures set forth in IDEA?; and (2) Has the school district fulfilled its obligation to provide the student with a FAPE?" *D.B. v. Gloucester Twp. Sch. Dist.*, 489 F. App'x 564, 566 (3d Cir. 2012).

## II.    Standard of Review

"The standard of review under which this Court considers an appeal of a[n ALJ] decision under the IDEA differs from that governing the typical review of summary judgment." *M.A. ex rel. G.A. v. Voorhees Twp. Bd. of Educ.*, 202 F. Supp. 2d 345, 359 (D.N.J. 2002), *aff'd*, 65 F. App'x 404 (3d Cir. 2003).

"When considering an appeal from a state administrative decision under the IDEA, district courts apply a nontraditional standard of review, sometimes referred to as 'modified de novo' review." *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010) (citation omitted). The ALJ's legal conclusions are reviewed *de novo. S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir. 2003)). For questions of fact, the District Court "must give 'due weight' to the findings of the state hearing officer" and must consider the factual findings from the administrative proceedings to be "'*prima facie* correct.'" *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 268 (3d Cir. 2012) (first quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982); then quoting *S.H.*, 336 F.3d at 270). Whether an IEP is appropriate is a question of fact. *Id*.

A district court is "authorized to make findings based on the preponderance of the evidence and grant the relief it deems appropriate." *D.S.*, 602 F.3d at 564. If the district court does not adhere to the factual findings from the administrative hearings, it must explain why, and may not "substitute [its] own notions of sound educational policy for those of local school authorities." *State-Operated Sch. Dist. of Newark*, 336 F.3d at 270. Moreover, "if a state administrative agency has heard live testimony and has found the testimony of one witness to be

13

more worthy of belief than the contradictory testimony of another witness, that determination is due special weight." *Shore Reg'l High Sch Bd. of Educ.*, 381 F.3d at 199. "Specifically, this means the District Court must accept the state agency's credibility determinations 'unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion.'" *Id.* (emphasis omitted) (quoting *Carlisle Area Sch.*, 62 F.3d at 529).

Finally, "the party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." *Ridley Sch. Dist.*, 680 F.3d at 270; *see also M.W. v. Medford Lakes Bd. of Educ.*, 2021 WL 3661453, at *7–8 (D.N.J. Aug. 18, 2021)

## **DISCUSSION**

### I.    **Plaintiffs' Grounds for Appeal**

Plaintiffs make two broad arguments against the ALJ's decision: (A) the ALJ failed to apply the correct legal standard, and (B) the Defendant did not offer Z.M. a FAPE for the 2018/2019 and 2019/2020 school years. (Pls.' Br. at 1, ECF No. 9-3.) As a result, Plaintiffs ask that this Court order Defendant to reimburse Plaintiffs for "all costs of ZM's unilateral placement at SHLI." (*Id.* at 40.) For the following reasons, this Court will affirm the ALJ's decision.

### A.    *The ALJ's Reliance on the "Basic Floor of Opportunity" Standard*

First, Plaintiffs argue the ALJ relied on an outdated and insufficient articulation of the FAPE requirement. According to Plaintiffs, the "ALJ reasoned that the District only had to provide ZM with 'a basic floor of opportunity.'" (*Id.* at 7.) They argue, however, that the correct standard is that the educational program must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." (*Id.*) Thus, Plaintiffs contend, because "[t]he ALJ's decision here relies on the antiquated and lower 'basic floor of opportunity' standard," "the ALJ's entire analysis is flawed." (*Id.* at 8.)

Plaintiffs' argument misrepresents the ALJ's opinion. The ALJ's opinion did, on one occasion, quote the phrase "basic floor of opportunity." (ALJ's Op. at 74.). Two sentences later, the ALJ elaborated that "[t]o meet its obligation to deliver FAPE, a school district must offer an IEP that is reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." (*Id.* (citing *Endrew F.*, 137 S. Ct. at 1003)) Thus, contrary to Plaintiffs' argument, the ALJ identified the correct legal standard. Furthermore, the ALJ then applied the correct standard when it found that the District "offered Z.M. a FAPE with the opportunity *for meaningful educational benefit* and progress *in light of Z.M.'s circumstances*." (*Id.* at 82 (emphasis added).) In sum, the ALJ identified and applied the correct legal standard.

B.     *The ALJ's Determination that the District Provided Z.M. with a FAPE*

Next, Plaintiffs make both procedural and substantive challenges to the ALJ's decision that Defendant offered Z.M. a FAPE for the 2018/2019 and 2019/2020 school years.

1.     Procedural Challenges

"The Supreme Court has made clear that the IDEA's 'procedural safeguards cannot be gainsaid.'" *D.S.*, 602 F.3d at 565 (quoting *Rowley*, 458 U.S. at 205–206 ). Indeed, the Supreme Court noted that "Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process, as it did upon the measurement of the resulting IEP against a substantive standard." *Rowley*, 458 U.S. at 205–206.

However, a procedural violation is actionable only if the violation: (1) impeded the child's right to a FAPE; (2) significantly impeded the parents' opportunity to participate in the decision-making process; or (3) caused a deprivation of educational benefits. *H.M. ex rel. B.M. v. Haddon Heights Bd. of Educ.*, 822 F. Supp. 2d 439, 453 (D.N.J. 2011) (citing 20 U.S.C.

§ 1415(f)(3)(E)(ii)). "Thus, not only must there be a procedural violation, that violation must result in a loss or deprivation of a substantive right." *Id*. Plaintiffs argue that Defendant made four procedural errors that each amount to a denial of FAPE:

i.    IEP Team Composition

First, Plaintiffs point out that no teacher from SHLI was present at the IEP meeting. (Pls.' Br. at 10.)  New Jersey law requires that the IEP team contain "[a]t least one special education teacher of the student . . . ." N.J.A.C. 6A: 14-2.3(k)(2)(iii); *see also* 20 U.S.C. § 1414(d)(1)(B)(iii). Further, "[i]f there is no special education teacher or special education provider of the student, a special education teacher or provider who is knowledgeable about the school district's programs shall participate." N.J.A.C. 6A: 14-2.3(k)(2)(iii)(1). The District argues that Plaintiffs cite to "no statute, regulation, or case law that requires a district to speak to or invite staff from a unilateral placement to an IEP meeting." (Def.'s Br. at 9, ECF 15-1).

Defendant satisfied the IEP team composition requirements. Where there are no district-employed teachers currently involved with the student's education, a teacher who is "knowledgeable about the [district's] programs" is sufficient to meet this requirement. *See G.A. ex rel. L.A. v. River Vale Bd. of Educ.*, 2013 WL 5305230, at *18 (D.N.J. Sept. 18, 2013) (finding that, because "no Board teacher had instructed [the student]," the district "was only required to provide a teacher knowledgeable about the programs.").[2] Here, no district employee taught Z.M. prior to the meeting. The District's BCBA and another special education teacher

---

[2] Other courts have reached a similar conclusion in interpreting the federal analogue to N.J.A.C. 6A:14-2(k). *See, e.g.*, *G.A. v. Hawaii, Dept. of Educ.*, 2011 WL 3861431, at *11 (D. Haw. Aug. 31, 2011) ("The student's private placement teacher is not a statutorily-mandated member of the IEP team under [20 U.S.C. 1414(d)(1)(B)]."); *Virginia S. ex rel. Rachael M. v. Dept. of Educ., Hawaii*, 2007 WL 80814, at *7 n.10 (D. Haw. Jan. 8, 2007); *Cone v. Randolph County Sch.*, 302 F.Supp.2d 500, 507 (M.D.N.C.2004).

attended the meeting to provide guidance regarding the District's programs. (Ex. Part 2 at 60, ECF 9-5.) Thus, Defendant adequately provided multiple individuals who were "knowledgeable" about the District's offerings. *See G.A. ex rel. L.A.*, 2013 WL 5305230, at *18.

Moreover, even if the failure to include SHLI teachers was a procedural error, that error did not amount to a denial of a FAPE. Not all procedural violations amount to a substantive deprivation of a FAPE. *See H.M.*, 822 F. Supp. 2d at 453. Other courts have found that the failure to include a student's district-provided special education teacher does not necessarily amount to a denial of FAPE when other qualified and knowledgeable staff are present. *See, e.g.*, *A.H. ex rel. J.H. v. Dept. of Educ. of City of New York*, 394 Fed. Appx. 718 (2d Cir. 2010) (finding absence of student's special education teacher at IEP meeting did not render IEP inadequate because other qualified staff members with knowledge of the district's offerings and the student's needs were present).

Here, qualified district staff—including Lilly, Eby, and a special education teacher— attended the IEP meeting. (Ex. Part 2 at 60.) Moreover, IEP team members observed Z.M. at SHLI. (Pls.' SUMF ¶ 22.) District staff requested teacher input forms from SHLI staff. (Def.'s SSF ¶ 23.) District staff received Z.M.'s progress reports from SHLI just prior to the IEP meeting and reviewed the reports during the meeting. (*Id*. ¶ 24.) The ALJ found that "Eby and Lilly . . . testified credibly as to what was taken into consideration in developing Z.M.'s IEP," including "review of Z.M's progress reports, program book, Dr. Hoch's evaluations and recommendations, tests, and observations." (ALJ's Op. at 62.) Given the IEP team composition, the District's efforts, and the ALJ's credibility determination, this Court finds that the failure to include SHLI staff did not amount to a denial of FAPE. (*Id.* at 76.)

      ii.      Predetermination of the IEP

17

Second, Plaintiffs allege that Defendant "determined its proposed program prior to meeting with Z.M.'s parents" for the initial IEP meeting in July. (Pls.' Br. at 11.) Plaintiffs point to the email correspondence between Eby and Lilly to prove that the District predetermined its proposed program in the proposed IEP. (Pls.' Br. At 11.)

"Predetermination of an IEP can be grounds for finding a violation of the IDEA, in particular because predetermination can serve to exclude parents from meaningfully participating in the decision-making process." *D.B. ex rel. H.B. v. Gloucester Tp. Sch. Dist.*, 751 F. Supp. 2d 764, 771 (D.N.J. 2010), *aff'd sub nom*. 489 Fed. Appx. 564 (3d Cir. 2012). However, that a district comes to an IEP meeting with a completed draft document, before consulting parents, does not render an IEP predetermined. *See G.A.* 2013 WL 5305230, at *20 (citing *B.G. v. Cranford Bd. Of Educ*., 702 F. Supp. 1158, 1166 (D.N.J. 1988)).

Defendant's proposed IEP draft was not "predetermination" of Z.M.'s IEP. A draft IEP is permissible if there is an opportunity for substantive parental input. *See G.A.* 2013 WL 5305230, at *20*. For example, in *Fuhrmann v. East Hanover Board of Education*, the Third Circuit found that an IEP was not predetermined because the district discussed the draft IEP with the parents and noted their suggestions. 993 F.2d 1031, 1036 (3d Cir. 1993). Here, the District consulted with Plaintiffs at the IEP meeting. Specifically, the District requested feedback from Plaintiffs, advised Plaintiffs that the IEP could be revised, repeatedly asked if Plaintiffs had any questions, and allowed Plaintiffs and Dr. Hoch to observe the District's offerings. (ALJ's Op. at 67–68.)

Moreover, the emails between Eby and Lilly do not prove predetermination. (Exhibit Part 2 at 39, ECF No. 9-5). The emails show that the District anticipated questions from Plaintiffs about the proposed IEP and attempted to gather answers to "defend" the initial proposal. (*Id.* at 53.) The emails also demonstrate that Eby and Lilly referred to the proposal as a "draft" and

noted that the IEP team could add more content later. (*Id.* at 39.) And the District did, in fact, adjust the IEP after receiving feedback from Plaintiffs' expert. (ALJ's Op. at 77.) In sum, Defendant offered Plaintiffs more than "after the fact involvement" here. *Fuhrmann*, 993 F.2d at 1036. Therefore, the draft IEP did not violate the IDEA.

### iii.    Failure to Consider Expert Input

Third, Plaintiffs contend that Defendant failed to consider the input from Plaintiffs' outside expert, Dr. Hoch. (Pls.' Br. at 12; *see also* Ex. Part 1 at 475, ECF No. 9-4.) Defendant cites numerous instances where Lilly discussed how Hoch's input was reflected in the IEP. (Ex. Part 1 at 386-389.) As noted above, the ALJ found that "Eby and Lilly . . . testified credibly as to what was taken into consideration in developing Z.M.'s IEP," including "Dr. Hoch's evaluations and recommendations, tests, and observations." (ALJ's Op. at 62.) Plaintiffs have not supplied any non-testimonial evidence that undermines this finding of credibility. *See Carlisle Area Sch.*, 62 F.3d at 529. Therefore, this Court accepts the ALJ's conclusion that Defendant considered Dr. Hoch's input.

### iv.    Parental Participation in December 2018 IEP Process

Finally, Plaintiffs argue that Defendant impeded Z.M.'s parents' opportunity to participate in the IEP process in December 2018.[3] (Pls.' Br. at 10.) Specifically, Plaintiffs note

---

[3] Defendant argues that Plaintiffs waived this procedural challenge because the initial Petition for Due Process "made no allegations pertaining to the IEP issued in December 2018." (Def's Br. at 9, ECF 15-1). The ALJ noted that it was "questionable" whether any of Plaintiffs' procedural challenges were properly before this tribunal. (ALJ's Op. at 76–78, ECF No. 1-1.) Assuming the procedural argument were not waived, the ALJ concluded that the alleged procedural violations were not actionable. (*Id.*) Because the ALJ considered the procedural challenges based on the hearing testimony, the administrative record, and briefing from the parties, this Court can also consider Plaintiffs procedural challenge. *See Woods on Behalf of T.W. v. New Jersey Dept. of Educ.*, 796 F. Supp. 767, 775 (D.N.J 1992) (finding an issue not waived because Plaintiffs raised the issue during a Due Process hearing).

19

that Defendant issued a new IEP without convening an IEP meeting. Defendant asserts that the failure to convene a second meeting to consider Dr. Hoch's report was not a procedural violation. (Def.'s Br. at 10.) In the alternative, Defendant argues that the failure to hold a second meeting did not deny Z.M.'s parents the right to participate in decision making. (*Id.*) Defendant makes four points to support their alternative argument: (1) the December IEP proposal did not change Z.M.'s placement; (2) the revised IEP incorporated feedback from Plaintiffs' expert; (3) Defendant sent the IEP to Plaintiffs' attorney, who rejected the proposal and gave notice that Plaintiffs would file for Due Process; and (4) Plaintiffs had significant involvement over the course of the entire IEP process, including attending an IEP meeting and observing the District's offerings twice. (Def.'s Br. at 9–13.) When the ALJ considered these arguments, she concluded that, given the communications between the parties and the minor changes to the IEP, "there is no evidence that [the failure to meet] adversely affected the student's or the parent's substantive rights." (ALJ's Op. at 77.)

This Court considers the entire IEP process, not "just [a] sliver" of the process and agrees with the ALJ. *See D.S. v. Parsippany Troy Hills Bd. of Educ.*, 2018 WL 6617959, at *18 (D.N.J. Dec. 18, 2018). "The fact that the child study team ultimately disagreed with [the] parents does not mean that the parents were denied meaningful participation." *L.G. v. Fair Lawn Bd. of Educ.*, 2011 WL 2559547, at *5 (D.N.J. June 27, 2011), *aff'd sub nom.*, 486 Fed. Appx. 967 (3d Cir. 2012).

Here, Plaintiffs parents were not "denied meaningful participation." *See L.G.*, 2011 WL 2559547, at *5. Z.M.'s parents attended the initial IEP meeting, observed the District's offerings twice, and hired an expert to observe the District's offerings. (Pls.' SUMF ¶¶ 27, 42.) At the IEP meeting, the "Plaintiffs were continually asked for input." (Def.'s SSF ¶ 24.)  When Plaintiffs

provided Dr. Hoch's feedback in December 2018, the District promptly attempted to incorporate that feedback in the December 2018 IEP proposal. (*Id*. ¶ 54.) Plaintiffs were not satisfied with the changes and gave notice they would file for Due Process. (*Id*. ¶ 112) Based on these facts, parental participation in this case rose to a level sufficient to comply with the IDEA. *See Bayonne Bd. of Educ.*, 602 F.3d at 565–66.

In sum, this Court agrees with the ALJ's finding that the "alleged procedural violations did not impede Z.M.'s right to FAPE, significantly impede the petitioners' opportunity to participate in the decision making process regarding the provision of FAPE to Z.M.; or cause a deprivation of educational benefit." (ALJ's Op. at 76.)

2.    Substantive Challenges

"When schools use their expertise to address each child's distinct educational needs, we must give their judgments appropriate deference." *K.D. by and through Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 250 (3d Cir. 2018) (citing *Endrew F.*, 137 S. Ct. at 1001–1002). The IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id*. at 250–51. But the Court may not "substitute [its] own notions of sound education policy for those of the school authorities which [it] reviews." *Id*. at 251 (quoting *Endrew F.*, 137 S. Ct. at 1001). The standard is whether the IEP is reasonable, not whether it is ideal. *Id*. at 255.

Whether an IEP is reasonable is a question of fact. *Ridley Sch. Dist.*, 680 F.3d at 268. For questions of fact, the Court "must give 'due weight' to the findings of the state hearing officer" and must consider the factual findings from the administrative proceedings to be "'*prima facie* correct.'" *Id*. (first quoting *Rowley*, 458 U.S. at 206; then quoting *S.H.*, 336 F.3d at 270).

Plaintiffs disagree that the IEPs in this case complied with the substantive requirements

of the IDEA. In addition, Plaintiffs argue that the ALJ made errors as to her determinations of witness credibility, the programming specified in the IEP documents, and other facts relevant to Z.M.'s case.

i.        The Adequacy of the IEPs

The crux of the disagreement in this case centers on two elements of the proposed IEPs. First, Plaintiffs argue that the 2018/2019 and 2019/2020 IEPs did not provide a sufficiently comprehensive level of ABA instruction. (Pls.' Br. at 14.) Second, Plaintiffs argue the IEPs would not have allowed Z.M. to make meaningful progress because Z.M. was not ready to participate in a group setting. (*Id*. at 16.)

As to the level of ABA instruction, Plaintiffs argue that assigning a full-time RBT to provide individualized teaching in a group setting is not a "Comprehensive ABA program." (*Id*.) Plaintiffs also point out that the BACB guidelines recommend six hours of BCBA supervision for every thirty hours of ABA programming—double the amount of supervision proposed by the District in the IEP. (*Id*. at 14.) Further, they note that, according to Dr. Hoch, a non-comprehensive ABA program with three hours of BCBA supervision would be inappropriate to meet Z.M.'s needs. (*Id*. at 16.)

The Court affirms the ALJ's decision regarding the adequacy of the ABA services offered in the July 2018 IEP. While a comprehensive ABA program may be ideal for Z.M., the IDEA demands that the IEP be reasonable, not ideal. *See K.D.*, 904 F.3d at 250. The IEP provided Z.M. with a full-time, one-to-one aide, who was trained to provide ABA instruction. (Ex. Part 2 at 76.) The IEP also required the use of "applied behavioral analysis techniques," and "individualized instruction." (*Id*. at 75.) Thus, the Court agrees with the ALJ that the ABA services offered in the July 2018 IEP were "appropriately intensive" to allow Z.M. to make

22

meaningful progress, considering his circumstances. (ALJ's Op. at 79.) The ALJ did not, as Plaintiffs suggest, "[find] the District's program appropriate without any support." (Pls.' Br. at 13.) Rather, the ALJ considered Plaintiffs' witnesses and reports, found them less convincing than other evidence, and justified her decision that the level of ABA offered met Z.M.'s needs. (*See, e.g.*, ALJ's Op. at 78, 83); *see also D.S.*, 2018 WL 6617959, at *19. Absent sufficient evidence to the contrary, which is not present here, the Court defers to the ALJ's findings. *Ridley Sch. Dist.*, 680 F.3d at 268.

With regards to the level of group instruction in the IEP, the parties hold different philosophies as to whether Z.M. was ready for inclusion with general education peers in July 2018. Plaintiffs, citing Dr. Hoch, argue that Z.M. would not have benefited from any small or large group instruction. (Pls.' Br. at 16.) By contrast, the District believed that peers could serve as positive role models for Z.M and that the lack of social interaction at SHLI impacted Z.M.'s social and pragmatic skill deficits. (Def's Br. at 3.) The proposed IEP explained that the District considered full day inclusion in the general education setting, but found that full day inclusion programming was "inappropriate because of [Z.M.'s] developmental delays." (Ex. Part 2 at 77.) Instead, the IEP proposed that Z.M. spend half the day in "a self-contained preschool setting for individualized instruction, extensive practice and repetition of skills, and small group environment to develop and practice the skills needed for the general education classroom." (*Id*.) Moreover, the IEP provided that the assigned RBT would be present with Z.M. to ensure consistency and generalization of skills in both the self-contained and the general-inclusion classrooms. (*Id.*)

The ALJ found that inclusion programing in the IEP was appropriate, given that Z.M. did not have high levels of disruptive behavior, had average cognitive skills, and had average

communication skills. (ALJ's Op. at 83.) Moreover, the ALJ felt that Dr. Hoch's opinion as to

Z.M.'s readiness was not convincing because Z.M. had shown some readiness to participate in

group settings as early as January 2018. (*Id*. at 60.) Finally, the ALJ emphasized that placing

Z.M. in a group setting at a district-operated school complied with the IDEA's requirement that

students receive their education in the "least restrictive environment that will provide meaningful

educational benefit." (*Id*. at 83) (citing *Carlisle Area Sch.*, 62 F.3d at 535). This Court agrees

with the ALJ's conclusion that the July 2018 IEP's supportive inclusion plan provided a FAPE in

the least restrictive environment given (1) the evidence in the record regarding Z.M.'s behavior;

(2) the IEP's attention to Z.M.'s skills and skill deficits; (3) the provisioning of a one-to-one

RBT; (4) and the ALJ's credibility determinations. (ALJ's Op. at 83.)

In sum, the 2018/2019 IEP, proposed in July 2018, provided Z.M. with FAPE.[4] As the

December 2018 IEP and the 2019/2020 IEP were substantially similarly to the July 2018 IEP—

with slight changes to the amount of inclusion time and a clarification of the language regarding

the ABA services—the Court finds that subsequent IEPs also provided Z.M. FAPE.

ii.    The ALJ's Findings of Fact and Credibility

Plaintiffs challenge the ALJ's findings on three additional grounds. First, Plaintiffs assert

that the ALJ made improper determinations of witness credibility. "If a state administrative

agency has heard live testimony and has found the testimony of one witness to be more worthy

---

[4] Because Plaintiffs failed to provide feedback until December 2018 and the District revised the
IEP upon receipt of that feedback, the ALJ found that the July and December IEPs should be
looked at in conjunction to evaluate whether the District offered Z.M. a FAPE for the 2018/2019
school year. (ALJ Op. at 81.) However, the ALJ also found that "even if looked at
independently, the July 2018, IEP provided Z.M. with [a] FAPE given what
information/documentation that the District had at the time it was prepared." (*Id*.) Because this
Court finds that the July 2018 IEP provided a FAPE, the Court need not analyze the July 2018
IEP in conjunction with the December 2018 IEP.

24

of belief than the contradictory testimony of another witness, that determination is due special weight." *Shore Reg'l High Sch.*, 381 F.3d at 199. "Specifically, this means the District Court must accept the state agency's credibility determinations 'unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion.'" *Id.* (emphasis omitted) (quoting *Carlisle Area Sch.*, 62 F.3d at 529).

Here, the ALJ made extensive findings explaining the testimony that justified her credibility determinations. (ALJ Op. at 59–62.) Plaintiffs urge this Court to take a contrary view based on the witnesses' relative qualifications, the credibility determinations of other ALJs, and the BACB guidelines that served as the basis for Dr. Hoch and Dr. Brothers' testimony. (Pls.' Br. at 21–31.) Upon review of the non-testimonial evidence in the record, this Court defers to the credibility determinations of the ALJ, who heard live testimony from the witnesses in this case. *See Shore Reg'l High Sch.*, 381 F.3d at 201 ("We do not suggest that [one expert] opinion was unworthy of belief or that the testimony of [the other experts] was beyond dispute. But the task of evaluating their conflicting opinions lay in the first instance with the ALJ in whose presence they testified. When the ALJ's determination in this case is given its 'due weight,' we see no basis for overturning that determination.")

Second, Plaintiffs claim that the ALJ improperly relied on information outside of the July 2018 IEP to make her ruling. Specifically, Plaintiffs argue that the ALJ relied on Eby's testimony that Z.M. would "initially be pulled aside [in the inclusion classroom] to see what his areas of strength were." (ALJ Op. at 7.) In her conclusions of law and fact, the ALJ wrote that "Individualized instruction would have taken place in both settings until the data indicated group instruction would be appropriate for him." Plaintiffs argue the notion of incremental inclusion was not specified as part of the July 2018 IEP.

25

"[I]n determining whether an IEP was appropriate, the focus should be on the IEP actually offered and not on one that the school board could have provided if it had been so inclined." *Lascari v. Board of Educ. of Ramapo Indian Hills Regional High School Dist.*, 560 A.2d 1180, 1189 (N.J. 1989). While it is a close decision, the actual IEP sufficiently supports the ALJ's statements. The IEP proposed that Z.M. spend half the day in "a self-contained preschool setting for individualized instruction, extensive practice and repetition of skills, and small group environment to develop and practice the skills needed for the general education classroom." (Ex. Part 2 at 77.) The IEP also lists "individualized instruction" specifically as a modification required under the program and provided Z.M. with a one-to-one RBT. (*Id*. at 75–76.) Thus, the ALJ did not err on this issue.

Finally, Plaintiffs note alleged factual errors in the ALJ's opinion. The cited "errors in factual determinations" rehash the substantive arguments listed above. (Pls.' Br. at 37.) Plaintiffs argue that the ALJ made fatal errors of fact because Z.M. was not ready for group instruction, the IEP did not provide for "1:1 instruction," and the IEP "did not call for Z.M. to receive any ABA instruction at all." (*Id*.) As noted above, the record supports the ALJ's decision.

C.    *Reimbursement for Z.M.'s Unilateral Placement*

The IDEA permits parents who believe that their child is not receiving a FAPE at a public school to enroll her at a private school and then request reimbursement from the school district for the private school enrollment. 20 U.S.C. § 1412(a)(10)(C)(ii). If a school district denies the parents' request for reimbursement, a federal court may order reimbursement only if the court concludes both "[1] that the public placement violated IDEA and [2] that the private school placement was proper under the [IDEA]." *Id*. Because the Court affirms the ALJ's decision that the public placement satisfied the IDEA, the Court need not determine whether the private

school placement at SHLI was appropriate. *K.G. v. Cinnaminson Township Bd. of Educ.*, 2018 WL 4489672, at *9 n.8 (D.N.J. Sept. 19, 2018).

## <u>CONCLUSION</u>

For the foregoing reasons, the Court will affirm the decision of the ALJ. Defendant's Motion for Summary Judgment (ECF No. 15) is granted, and Plaintiff's Motion for Summary Judgment (ECF No. 9) is denied. An appropriate Order will follow.


Date: <u>December 7, 2021</u>                                    <u>*/s/ Anne E. Thompson*</u>
                                                                       ANNE E. THOMPSON, U.S.D.J.